Good morning, your honors. May it please the court, my name is George Cullen, also may it please the counsel. Can I request, if possible, two minutes rebuttal? Sure, watch your time. I'll try to help you out as well. Yes, ma'am, I will. This case is on appeal from a decision by Judge Settle in Tacoma on a case involving a matter that began in December of 1995. There are two published cases in the state appellate courts regarding various stages of this case. And it finally got dismissed, the charges were dismissed. The evidence was held by the appellate court in Tacoma, the state appellate court, that it was a trespass, essentially, that the officer was on Mr. Littlefair's property when he obtained... Right, I think everybody agrees with that. The problem, of course, in Washington is they don't have the good faith exception on the exclusionary rule, right? Correct, your honor. So therefore, they didn't reach the good faith issue, which is our issue now. And there is, your honor, a well-developed case authority in our circuit that addresses that. And that's why I relied on Liston, because Liston was an omission case, it was basically a pure omissions case, and the central concern of that was, was the person, was Rocky Hill still living at that residence? And there was a for-sale sign, real estate, with a sold cross pasted across it for several weeks that wasn't included in the affidavit. And there's also a case in Pierce County here in this state, also, I don't have the case name, it's one of the major cases in our federal district court. It starts with an H, I think. What is this property like? You know, one of the things we don't get in an appellate record is a videotape or high-definition photographs. I know there are some maps and things, but can you describe the terrain where this occurred, what it was like, what the properties were like? I've been to the property several times. There are two lots adjacent to one another. They're about two, two-and-a-half acres apiece. They're mostly level. There's a little grassy knoll where this underground container is at, and then there's Trout Creek to the north, and that, of course, is very steep. I would say 100-foot-plus drop down to the creek. Is it wooded? Yes, Your Honor. These two parcels, the appellant's parcels, are very wooded. Do I understand? But the timber company is more clear-cut? Yes, Your Honor, and that was clearly admitted to and acknowledged by Detective Gonser. He was aware that Longview Fiber had clear-cutted their property, and that's what the aerial photographs from the Department of Natural Resources establishes. That was true. They were clear-cutted, and he even admitted that the property line was up where the tree line's at. But he thought that basically where the big trees were was where the property line of your client started, right? Your Honor, that's what he claims, and that is true. And if you look at the color photos, I mean you basically see sort of some clear-cut plus some scrub brush type stuff, and then you see these big trees. Yes, Your Honor. And excerpt record page number 64. I was looking at those aerial photographs taken by the appellant, and they're very deceptive. That's why, if I can direct your attention to excerpt 64, which shows the piled lumber and then the barrels. The barrels are actually all within a 20 to 25-foot circumference area, but the barrels are basically under branches of a tree. And if you read the affidavit submitted by Detective Gonser, he claimed that he was standing about 20 feet west of this area. And if you look at the map, although legally it's a 90-degree property line corner there, that area where the lumbers are at, it's almost like a 45 degree. It's deceptive in that respect. However, if you're scanning. . . Can I just ask you on that number 64. . . Yes. Who took that photo? That was taken by Mr. Lilfair back in. . . And that's an aerial view. Oh, I must have. . . Here, let me make sure. I'm asking you which one you're referring. You know, that is actually one of the problems with the record below, and it happens very often, you know, you'll be reading his deposition or somebody's deposition and say, yeah, it's this one right over here. And, of course, you can imagine everybody looking at the map, but we can't understand what they're looking at. And we don't have the video tape that the state court referred to as part of our record. Unfortunately, after it was submitted, nothing happened for three years, and, of course, after that there were other allegations brought up against Mr. Lilfair. By then they were destroyed. So. . . Oh, here it is. Oh, yes, yes, ER-64. It's two pages. Right. And those are aerial? No, no. These are from the ground. Oh, those are from the ground. Okay. It's kind of nice to say, well, we got aerial photographs, but in reality looking at them they're quite deceptive. When you're on the ground you can see the barrels in the back there, the stakes here, and the bottom picture is looking westward. So you can see the tall timbers, that's on Mr. Lilfair's two lots, and the top picture it's looking northward. And everything, so everything east of that line and south of the lines are clear cut by Longview Fiber. Why wouldn't he, in good faith, he thought he was on Longview Fiber's land when he was looking at this. This is not in the middle of all these big trees. Exactly, Your Honor. Well, why wouldn't he have, in good faith, couldn't he have believed, as he said, that he wasn't on Mr. Lilfair's property, that he was on the Longview Fiber property? Whether or not that was, in fact, a good faith statement? Right, because as you look at these photos, his understanding was, of course, when this had been clear cut and low and that the big trees, of course, were Mr. Lilfair's property was within the big trees. And here he's not inside the big trees. Well, the picture is taken standing in the clear cut. And it's looking in. And if you look at the barrels, they're at least 20 feet further in towards the trees from the lumber itself. Well, I know, but they're not in the middle of the tall trees. Oh, no, they're not, no. Okay. And here's one thing that bothers me, Your Honor. There was a confidential informant that informed that there's this underground container on Longview Fiber property. Yet, Detective Gonser was targeting Mr. Lilfair since 1992 when he was assigned to the Drug Task Force. And he admitted, he even admitted in his deposition, if you read it, that the helicopter would stay the night on his property. And so there was nothing wrong with that, other than the fact that here he is flying right over the property. And he even admitted, when I showed him the aerial photographs taken by Mr. Lilfair and there's another exhibit, that, yeah, those are the kind of views he would appreciate taking. So he's not paying attention to one of his suspect's properties where he lives literally right across the Wind River from. And that's what I don't understand. He understands where the tree lines are at. And he did admit it to it. He did admit to the tree lines being the property line. With counsel, you're saying, are you arguing that negligence by Mr. Gosner or Sheriff Gosner would be a violation of Mr. Lilfair's constitutional rights? Not negligence, Your Honor. I am arguing that he deliberately withheld evidence. He should have included. You have to argue that he deliberately withheld evidence. Negligence wouldn't cut it, Your Honor. But there's tribal issues of fact as to whether he deliberately withheld evidence. That's the point, Your Honor, that we feel we were denied. Now, he was, the detective was out there at night on the ground? That's when he was doing the surveillance, yes. And he wasn't. Just answer the question and I have a couple of follow-ups and you have limited time and so do I. Yes, Your Honor. So he's out there at night with a flashlight. Was he out there at night or not? With a compass. He was out there at night, correct? Yes, Your Honor. And he had a flashlight. I don't believe he ever said that he had a flashlight. Okay. How was he seeing where he was? He did answer that question, Your Honor. He knew the area. And he could see against the night sky where the tall timbers were. And that's, I've been in the bush, and if you're in a clear cut you can see the outline of the trees. Was this underground bunker deliberately designed so it would avoid detection? Probably. It's a pretty easy yes, isn't it? Well, yes, and also to protect property in case of a forest fire fire.  And was the bunker, in fact, all on Littlefield property? Yes, Your Honor, entirely. Even the outside, the barrels outside, the entire structure underground was all located on his property. Here's the part I'm having trouble with. If he thought that the Littlefield property was in the tall, that the line went along the tall trees, which you see pretty markedly here, and this is not in the tall tree area by any means. It's an area that either looks clear cut or has a few small trees. Why, if he got information that the bunker is on Longview fiber land, he thinks he's on Longview fiber land. He thinks over here is the property line for your client. Why isn't that in good faith? Well, Your Honor, if that was in good faith, then he would have no business going right up to the property line. He was told it's on Longview fiber property. Well, if he didn't go, if this is not, well, there's even a ways from this to the tall trees according to these photos. Maybe not a long ways, but there's some ways. It's not like these barrel things are here and the tall trees are here. The tall trees are here. The little bunker thing is here, and then there's some space, at least in all the photos we see. Well, that's why I asked if you can look at ER-64, because that shows the barrel, and it's almost right under a tree. Well, a tree, but you see, yeah, there are a few little trees out there, but they're not the tree line. That is not the tree line. Would you agree with that? That is a tree line, Your Honor. Yes, there is. Because there's a tree there? In fact, if you look at the aerial photograph, you can see smaller trees planted right along the line, and it's a well-defined line. So he's flying overhead in a helicopter, Your Honors, and that's not a definition of the right angle of the property line, which the assessor's map shows it as being a 90-degree right angle. We're talking about a gentleman who's been in law enforcement doing these sorts of operations. He's trained to do this. So before he gets the warrant, is there snow out there at that point? Yes, in December of 1995, yes. Okay, there's snow out there. And then there's a dispute over the stakes, which the state court and others have said, well, actually they're not very easy to find or see. That's disputable, Your Honor, because he did find the well-defined footpaths. So he could see that in the night, but he can't see the stakes, which are steel. So normally steel and snow, they melt during the daytime. Even during the nighttime, they're a different substance. So basically, though, I mean, if an officer makes these statements and it's not inconsistent with the record, have you met your burden? Yes, because look at ER 139. That's the map of the – he submitted Exhibit 139, ER 139. That's the map with the asterisk. Right. And he did it approximately halfway through Lot 10. So he was 170 feet off of there. And he totally skipped Lot 11, so that's 285 feet. He was over 450 foot off, and he knew that there was a clear cut due east of that marker that he was looking for, searching for. Yet there are tall trees. If it's true that it was located where he claimed it was, he knew that he was off, because he knew that there were no tall trees east of that point. Ken, clear up one thing. Technically, the officer's name is Gonser? Gonser is my understanding. Gonser. Arnie Gonser. I know that – I noticed that your opening brief and your excerpts refer to him as Goner, Goner. I apologize if I did. Slight Freudian slip, perhaps. But the – My spell checker. I apologize. You're down to one minute, and you probably want to resolve that. If I can hear, please. Okay. Thank you. Good morning, Your Honors. My name is Robert Novasky from the Law Firm of George Fitzgerald, and I represent Arnie Gonser, the detective at the time, now sergeant with the Skamania County Sheriff's Department. First of all, with regard to the record, if the court looks at ER 63, which is right before the two photographs that were being referred to, that is an aerial of the Little Fair property, and what the court will note is that there is the creek, Trout Creek. To the left of that is – Don't give me lefts. Give me east, west, north, and south. I can't from that photo, Your Honor, honestly, because I'm referring to the photo only, and so it's hard for me to give compass directions because of the angle of the photo. There is a structure that appears to be a house that's white, and then to the left of that, beyond the tall trees, is a small white object, and that has been established by Mr. Little Fair in his deposition as the area where the barrels and the wood was. And then going to ER 64, the bottom photograph, the court has already hit on a crucial point, and that is that the tall trees are beyond where the barrels were. In fact, you will see a no trespassing sign that's posted on one of the tall trees that is beyond where the barrels were, and supports Deputy Gonser's affidavit indicating that, based upon the information he had and the map he got from the assessor's office, he had a good faith belief that the container was on the Longview Fiber property. How do you handle the two pieces of circumstantial evidence which tend to show that he didn't have a good faith belief? Number one, that their property stakes at the corner, at the northeast corner of the Little Fair property, which were painted, I think, red with a white distinction, and he agrees that he understands what a property stake is, the property stakes there, and also that in his deposition, he put an asterisk boldly, well, let's eliminate the adverb, he put an asterisk some 450 feet away from where he found the barrels, and clearly on the timberland. Could not a reasonable trier of fact take those two pieces of circumstantial evidence and say we think that Sheriff Gonser was being zealous, but deceptive to the judge in his application? That's exactly what the appellant is arguing, Your Honor, and in fact, if the court assumes that those two pieces of circumstantial evidence were improper by Deputy Gonser, even taking that into account, based upon the legal standard that's set forth in Franks v. Delaware, which we've cited in our brief, 438 U.S. 154, and the cases subsequent to Franks, those two pieces of circumstantial evidence by themselves are not enough. If you look at the affidavit that Deputy Gonser swore out before he got the warrant, and his affidavit is located at ER 131 through 139, which includes the drawing. In that affidavit, Deputy Gonser goes through the investigation that occurred between 1990, when he first got information from the then-retired sheriff about information that he had regarding Mr. Littlefair, all the way up to 1995, and details various forms of information that Deputy Gonser got. He was a member of the Drug Task Force. He wasn't necessarily targeting Littlefair, but he was getting information as the years passed from different people, including different law enforcement agencies, indicating that Littlefair was involved in, or suspected to be involved in, the same crime. Franks tells us that when a police officer misleads a magistrate, the consequent warrant is invalid, right? I don't believe it says that in that umbrella, Your Honor. What it says is, given the totality of the circumstances, if we look at the misleading evidence and we take that out and still look at the warrant, is there enough in the warrant without the misleading evidence to allow a magistrate or an officer to make a decision that a warrant would issue? It's a three-step process that Franks went through, and, in fact, the first step says that an appellant must come forward with something more than his own beliefs or his own feelings. He has to show proof. He has to show proof and evidence in the form of affidavits of witnesses, material evidence that can be presented to the court. Only if that is done do we go to step two, which says if those requirements are met, then we look at whether or not this information was given with false disregard or reckless abandon, essentially, as to whether or not it's truthful evidence. Would you then focus on the asterisk issue? Because it seems to me that may be the biggest or one of the hurdles you need to overcome as to why that wouldn't be in good faith given all of his other evidence that he's put in. Deputy Gonser, it's in ER 100 through 120, roughly, which is the portion of his deposition in the record that talks about the surveillance he did and the detail he went through. He did do it at night. He did do it in the wintertime in the snow. He was going across Longview Fiber Property. He was using this map, and what he thought was the end of Gordon Road was actually an extension of Gordon Road that Mr. Littlefair had admittedly put in after he purchased the second piece of property. And so when Deputy Gonser went out to maneuver through the Longview Fiber Property, he misunderstood because what he saw was not, in fact, Gordon Road, but it was a private extension that Mr. Littlefair had put in. Which wasn't on a map at that point. I don't believe it's on a map now, Your Honor, because it's not a recognized road by the county. And so when Deputy Gonser was there with his flashlight in the dark in the wintertime, what he saw and believed to be Gordon Road is where he located on that map the asterisk. And, in fact, what we know now after the fact, many years, is that that was an extension of Gordon Road. So he was not deliberately misleading anyone. He was acting based upon the observations he made at the time. The Franks decision has been recognized and affirmed by the Supreme Court subsequently and also by this Court. In fact, the appellant refers to the Hervey case, which was a case involving a task force that raided a Pierce County home under suspicion of methamphetamine. And in that case, the Court held that the affidavit for the warrant. But applying your reading of Franks, what misleading circumstances, on summary judgment, indulging in all intendance in favor of the non-moving party, would you take out? I mean, the circumstantial evidence regarding the stakes in the asterisk show that there was some doubt as to whether Mr. Gonser thought he was on timber property or he was on little fair property. Correct. So you would have to take out in your Franks analysis any statements that the stash or the underground construction was on the timber property. No, Your Honor, we wouldn't, for two reasons. Because what is questioned by the stakes and by the asterisk issue is whether Gonser really knew that he was on timberland property or that he was on little fair property. With all due respect to the Court, though, that's not the Franks standard. The Franks standard requires that the appellant must come forward to show evidence of intentional behavior, intentionally misleading, or recklessly omitting facts. And there isn't any evidence before the Court by the appellant that that occurred in this case. Well, that depends on your view of matters, perhaps. The appellant takes the view that if Gonser knew what property stakes were, and if property stakes were visible, he should have known, and he did know, that he wasn't on timber property, that he was on little fair property. And as a result of that knowledge, he misdrew deliberately by placing an asterisk 450 feet west and south of Gordon Road. Everything that you just said, Your Honor, is true with one exception. And that is that Mr. Little Fair has not provided this Court with any evidence whatsoever that Deputy Gonser did know. And that's the standard that has to be met. Can a reasonable jury say that a person who's been stalking the property for three years, from 1992 to 1995, and knows where the stakes are, could not have blundered onto Little Fair property? Under the evidence that's before the Court right now, it doesn't get to a jury. It has to be a decision made by the Court, because the standard is a legal standard. And the standard is that, is there enough evidence in the affidavit? To allow a juror to find? To allow an officer of the Court to issue a warrant. That's the standard. And so in this case, I'm sorry, go ahead. In this case, Your Honor, what we have is a nine-page affidavit of warrant that details several different phases of investigation, including information from other law officers about Mr. Little Fair. And if you were to take out the two pieces of questionable evidence, and again, questionable does not mean intentional, but assuming that the Court takes those two out, the question then becomes, with the remainder of the information in that affidavit, that nine-page affidavit, is there enough for a reasonable officer of the Court to issue a warrant? The State Trial Court found that the corner property markers were, and I'm quoting, subtle and not readily apparent during the day, but especially at night. Is that correct? That's correct. Did Judge Settle rely upon that factual finding? No, he did not. He didn't specifically rely on anything in the State Court holding. There was testimony from Deputy Gonzer in the deposition, and I can't recall a page number for you, but there was deposition testimony that he did not, in fact, see any corner stakes when he was out doing his surveillance. And is there anything contrary to that, other than a photograph that the stake existed? Well, the photographs in ER-64, Your Honor, there's no evidence that those are corner stakes. Those are stakes, but those aren't corner stakes. And I don't think there's any dispute that there were stakes in the ground at the corners. The question was, where were the corners? And Deputy Gonzer did not know where the corners were when he was doing his surveillance because he didn't understand that the road had been extended. That information was not available to him. Well, let me ask you, that stake that you see in Exhibit 64, do we know from the map or otherwise that it is a corner stake? No, we don't know. I mean, there was questioning about that in the depositions, but it was never established as a matter of record or undisputed fact that those stakes in 64 were corner stakes or were even present at the time that Deputy Gonzer was there. But the testimony he has, he didn't see any stakes. Right. And then his other, what about his overflight surveillance that had occurred prior? Had he done any overflight surveillance since that 1995 period? Not of the Little Fair property. Not of the Little Fair, okay. Deputy Gonzer testified about the surveillance that he did as part of the task force that he was involved in. And he did say that he flew in helicopters and that he likely flew over the Little Fair property. But he wasn't asked and he didn't indicate that they ever did surveillance of the Little Fair property. It was a matter of going over the property when they were going to and coming from their destination. And there isn't any evidence to the contrary. When the warrant was executed, did the detective have a representative of Longview Fiber with him? Yes. And a matter of fact, in the ER 100 through 120, Deputy Gonzer specifically testifies that there was a security officer from Longview Fiber who was present when the warrant was executed because of the fact that Longview Fiber also believed that the container was on its property. Now, with regard to the standard that's set forth, the other thing that's argued by the appellant is that Deputy Gonzer didn't do enough, that he should have gotten more than just the assessor's map. And I would direct the court to the Liston versus County of Riverside, which is the case that the appellant relies on fairly heavily. But in that case, there's a couple of things. First of all, in that case, the issue of whether the house was for sale or sold was a crucial issue and the issue that was relied upon because what happened was the officer left out the sold part of that information to the court in the affidavit. They went in and arrested the wrong people because new people had moved into the house. And the court said that was a crucial time-centered issue, which we don't have in this case. Secondly, moving on to the Ewing versus City of Stockton case, 588F2nd, or excuse me, F3rd, 1218, the court held that it's not what an officer should have done. What the court looks at is what did the officer do at the time and whether or not that was appropriate. And what we have here is Deputy Gonser testifying that he looked at the information he had. He went and got an assessor's map. He determined by his surveillance where he believed the container to be consistent with the information he had. It's not a standard for the court to say, well, could he have gone to DNR and gotten aerial photos? Could he have gotten a better map? That's not the issue. The issue is with the information he had, did he have a good faith belief or was he intentionally misleading the court? Thank you, Mr. Hrabowski. Your time has expired. Mr. Colon, I think you have some time for a rebuttal, about a minute. Yes, ma'am. May it please the court and counsel. The security guard was told that it's on Longview Fiber property, so they believed naturally that it would be. That's just a clarification. My question was, if he was, Detective Gonser believed all along that this was on Littlefield property, when he executed the warrant, why would he bring someone from Longview Fiber with it? Makes it look good. Makes it look authentic, Your Honor. I mean, he lives right across the creek. I mean, they could throw slingshots probably at each other's porches. I mean, I'm being rhetorical, but you can see that. I mean, if you go there, you can see the houses, and that one aerial photograph shows them. If I can draw your attention, Your Honor, ER 135, that's one of the pages, page five of the affidavit. In there, Detective Gonser was told as of January of 1995 that there are barrels and piles of lumber. That's the location of the so-called underground container. He had that entire summer of 1995 to fly over that area to scope out the area for the location, and he admitted that he had good views from the helicopter. I know there's no evidence, and I doubt that he'll ever admit that he observed those barrels from the air, but that evidence is there. I mean, if he was blind, that's one thing. If he was flying the helicopter, not paying attention, but he was targeting Mr. Littlefair, and he's off by over a football field, 360 feet if you count the end zones. And on paragraph three of ER 135, it shows that, oh, sorry, paragraph four, he did these clandestine nighttime in camouflage gear ruses, not ruses, where he's crawling through the brush, not announcing himself to Mr. Littlefair, on January 24th, 1995, March 23rd, 1995, May 12th, 1995, June 13th, 1995. And finally, December 27th of 1995. So in December, there's snow. I can't argue with that. Well, in December, he got it in a tip. He knew at the time, supposedly, Gunzer was out of town. He may not be growing, but then he gets a tip, so doesn't that trigger? But he's always targeting Mr. Littlefair. He was told by an informant in January of 1995, there's a look for barrels in a pile of wood. So he had that whole summer to look, even though he was targeting Mr. Littlefair since 1992. Why don't you wrap it up, because you are over your time. Oh, sorry. Do you want to make a concluding remark? I believe that Mr. Littlefair is not entitled to a hearing, as Frank's would require, but I believe that he should be entitled to have a jury consider the evidence, Your Honor. Thank you. Thank you. Thank you both for your arguments this morning. Littlefair v. Gunzer is submitted.
judges: Hawkins, McKeown, Bea